[Civ. No. 40499. Second Dist., Div. Five. Dec. 7, 1973.]

CHICKEN DELIGHT OF CALIFORNIA, INC., et al.,
Plaintiffs and Appellants, v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY
et al., Defendants and Respondents.

**842**

## COUNSEL

Cummins, White & Breidenbach and Anthony E. Shafton for Plaintiffs and Appellants.

Cushman & Grover, Melvin B. Grover and Thomas Moore for Defendants and Respondents.

## OPINION

**KAUS, P. J.** — Declaratory relief. Two corporations, Chicken Delight of California, Inc., and Chicken Delight, Inc., an Illinois Corporation ("Chicken Delight")[1] appeal from an unsuccessful attempt to obtain a declaration that State Farm Mutual Automobile Insurance Company ("State Farm") and Allstate Insurance Company ("Allstate") should have defended them in an action for personal injuries and are responsible for reimbursing them for the cost of defense and the sum of $15,000 which Chicken Delight paid for a release.

### FACTS

The accident which ultimately led to this litigation happened on June 30, 1968. The victim was one Maria Radakovic, a pedestrian. She was run down by a Volkswagen automobile operated by one Robert John Hutchins. None of the parties to this litigation ever questioned the fact that the accident was a case of liability as far as the driver, Hutchins, was concerned. Eventually it was stipulated that the sum of $80,000 paid to Maria Radakovic in settlement of her claims was reasonable.

The Volkswagen which Hutchins was driving with permission at the time of the accident was registered to his mother, Maria Hutchins, and

---

[1] Although the two corporations are distinct entities, for the purpose of deciding the issues on this appeal they may be treated as one.

was insured by State Farm. The "per person" limit in the State Farm policy was $15,000.

At the time of the accident Hutchins was making deliveries for Donald J. Swan, a Chicken Delight franchisee, by whom he was employed. Swan did business under the name of Chicken Delight of San Pedro ("San Pedro"). Allstate had issued an automobile policy on a Ford automobile owned by Swan. The per person limit on that policy was also $15,000. In addition Swan had purchased a so-called "employers' non-ownership liability endorsement" to that policy. Further, he carried an excess policy with Chicago Insurance Company ("Chicago") which apparently had a per person limit of $100,000.[2]

San Pedro's franchise was originally obtained from Chicken Delight, the franchisor, on December 4, 1961. At that time San Pedro was a partnership, consisting of Swan and one Russell L. Richards. This partnership was dissolved a few months before the automobile accident of June 30, 1968. On October 24, 1968, Swan and Chicken Delight entered into a new franchise agreement, the terms of which differed in certain respects from the 1961 agreement.

The named defendants in the Radakovic action were Robert John Hutchins, the driver of the Volkswagen, and Chicken Delight. The complaint contained an allegation to the effect that at the time of the accident of June 30, 1968, Hutchins was the employee of the other defendants and acting within the course and scope of his employment.

Chicken Delight filed an answer, prepared by the attorneys who have represented it throughout this dispute. It also filed a motion for summary judgment in which it was claimed that there was no triable issue of fact with respect to its vicarious liability for the tort of one of San Pedro's employees. In ruling on that motion the court had before it declarations from Swan and one W. M. Rule, a vice president of Chicken Delight to the general effect that the relationship between Chicken Delight and San Pedro was simply that of franchisor and franchisee, and that the only controls over San Pedro which Chicken Delight exercised were those "pursuant to the Franchise Agreement and primarily designed to protect [Chicken Delight's] trademark and to protect its business image." Also before the court were the franchise agreements of December 4, 1961 and October 24, 1968. The motion for summary judgment was denied in February 1969.

---

[2] The Chicago policy was never introduced and its precise terms are therefore unknown to us.

The Radakovic claim was eventually settled for a total payment of $80,000. Thus sum was made up as follows:

| | |
|---|---|
| State Farm | $15,000 |
| Allstate | $15,000 |
| Chicago | $35,000 |
| Chicken Delight | $15,000[3] |
| | $80,000 |

This settlement was consummated in September 1970. In the meanwhile Chicken Delight, through its counsel, had made various attempts—including but not limited to the filing of the complaint in this declaratory relief action—to cause State Farm and Allstate to take over the defense of Chicken Delight. Both refused.

Chicken Delight's theory why State Farm insured it was simplicity itself: the State Farm policy contained the compulsory "omnibus" clause which provided coverage to the named insured and "any person or organization legally responsible for the use of [the automobile] by an insured. . . ." and the Radakovic complaint asserted such responsibility on the part of Chicken Delight.[4] The precise theory under which counsel for State Farm, Mr. Phillip L. Bradish, disclaimed coverage on behalf of his client was announced in three relevant paragraphs of a letter dated December 12, 1969, addressed to the Travelers and quoted in the footnote.[5] Later,

---

[3]This sum of $15,000 was paid on behalf of Chicken Delight by the Travelers Insurance Company which insured its liability, if any, with respect to the Radakovic accident up to a limit of $1,000,000. Although counsel for Chicken Delight valiantly attempted not to let this particular cat out of the bag, it inevitably appeared from the oral and documentary evidence that it was the Travelers which had retained counsel for Chicken Delight in the Radakovic litigation. It escapes us why this fact of life which was known to everybody concerned was considered unmentionable in the context of this declaratory relief action. (Cf. *Causey* v. *Cornelius,* 164 Cal.App.2d 269, 273-280 [330 P.2d 468].)

[4]A similar theory based on a misapprehension concerning the contents of the Allstate policy was advanced in a letter from the Travelers to Allstate. As we shall see plaintiffs' contentions with respect to Allstate never had any basis in law. We may ignore them for the present.

[5]"I have submitted your request and demand that State Farm take over the defense of CHICKEN DELIGHT . . . to the Company, and have recommended that the Company refuse to take over the defense of Chicken Delight . . . for the reason that neither of those entities would qualify as an additional insured under the omnibus clause of our policy.

"CHICKEN DELIGHT . . . in a motion for summary judgment, which was denied, made a declaration in writing to the Court that CHICKEN DELIGHT . . . had no control whatsoever over the operations of CHICKEN DELIGHT of San Pedro and/or ROBERT JOHN HUTCHINS. If the declaration be true, then certainly CHICKEN DELIGHT

during the trial of the declaratory relief action, Mr. Bradish testified, consistent with the position he had taken in his letter, that when about nine months later plaintiffs again demanded that State Farm defend them, he was surprised because his reading "of the declarations filed in the summary judgment action [*sic*] indicated to [him] that Chicken Delight . . . had no position in the case at all and in no way would be responsible." He had never read the franchise agreements. He knew, of course, that the motion for summary judgment had been denied. However, he attached little importance to the denial because such motions are rarely granted.

Of key significance to a proper disposition of this entire controversy, at least as to State Farm, is Mr. Bradish's testimony, never contradicted, that "State Farm's $15,000 was always on the line and available."[6] He had informed all parties that in his opinion the Radakovic case was a serious one and that "the limits of [State Farm's] policy were available to anybody who wanted to conduct further settlement negotiations."

Before the case was actually settled, there appears to have been a certain amount of maneuvering on the part of Chicken Delight, designed, no doubt, to extend the State Farm and Allstate policies beyond their $15,000 limits. Specifically on August 28, 1970, counsel for Chicken Delight wrote a letter to Allstate, State Farm, Chicago and their attorneys advising them that Chicken Delight was about to pay $15,000 "for appropriate releases and dismissals." The letter demanded, in effect, that the insurance companies addressed pay the $15,000 which Chicken Delight was about to pay and threatened that if such payment—or in the alternative, a defense on behalf of Chicken Delight—were not forthcoming, the companies' refusal would be considered in bad faith.

No favorable response was received and a few days later a full release was obtained on behalf of Chicken Delight. Hutchins, the driver, and Swan ("San Pedro") were specifically excepted from the operation of the release. A few weeks later State Farm, Allstate and Chicago settled with Radakovic for further payments totalling $65,000. The Radakovic suit was dismissed.

Further facts will be noted as necessary to our discussion.

. . . would not be legally responsible for any of the acts of CHICKEN DELIGHT of San Pedro.

"We are returning the copy of the complaint for damages and personal injuries to you at this time for whatever further action you desire to take."

[6] No similar evidence concerning Allstate was offered. It did, of course, eventually contribute its $15,000 limit.

## The Allstate Policy

Chicken Delight claims protection under an endorsement to the All-state policy and asserts that Allstate's refusal to defend extended Allstate's limit beyond the $15,000 which it contributed to the settlement.

It will be recalled that the basic policy covered a specific automobile owned by the insured, Swan ("San Pedro"). The endorsement in question purported to apply the provisions of the basic policy to "non-owned automobiles." Its application was, however, restricted to the named insured. It provided coverage for "the use, by any person other than the named insured, of any non-owned private passenger automobile in the business of the named insured. . . ."

Chicken Delight's main problem with respect to the Allstate policy is that it is not the named insured thereunder. It attempts to get around this problem in two ways.

First, Chicken Delight refers to a declaration sheet to Swan's policy which, under the heading of "Description of the Automobile" has the following notations: "Item 3 73 Ford [serial number], 4 non-ownership." Somehow or other, under Chicken Delight's theory, this cryptic notation brings the omnibus clause of the basic policy covering the described Ford into play with respect to non-owned automobiles.

What Chicken Delight is attempting to do is an absurdity when one reads the policy and the endorsement together. The reference to "non-ownership" on the declarations page is obviously intended to refer to the employer's non-ownership liability endorsement, from which Chicken Delight gets no benefit because it is not the named insured. This, however, Chicken Delight would have us ignore. Instead the word "non-ownership" is supposed to be read into the basic policy so that where the omnibus clause therein refers to "the automobile" it refers really to Hutchin's Volks-wagen. This, however, does violence to the definition of "automobile" in the basic policy, which—for present purposes—is admittedly confined to "the motor vehicle . . . described in this policy." Chicken Delight's answer to that is that the word "non-ownership" describes a vehicle.

Fully conscious of all the rules of construction pertaining to insurance contracts, we disagree.

Chicken Delight's second argument against Allstate is that it really is "the named insured." In the Allstate policy the named insured is simply

described as "Chicken Delight." The address given is "26169 South Western Ave., San Pedro, Calif." the place where Swan did business as a franchisee of Chicken Delight.

With all respect, this argument seems almost demeaning. A franchisor who, as the record shows, insisted in its franchise contract that the franchisee "shall use only the name 'Chicken Delight' . . . and that his place of business shall be known only as 'Chicken Delight,'" now claims that it is the named insured in a policy of liability insurance issued to the franchisee under the name he is contractually obligated to use, at his own address, where no one but the franchisee does business! The very extravagance of the claim must be the reason why no case directly in point has been found.

■ Chicken Delight's claim against Allstate thus founders on the fact that it was neither a named nor an additional insured on the Allstate policy. This makes it unnecessary to consider to what extent the reasons for which we are about to affirm as to State Farm, apply equally to Allstate.

### THE STATE FARM POLICY

State Farm owed two separate duties to those protected under its policy: the duty to defend and the duty to indemnify. We will discuss them separately.

■ No one disputes the basic rule that the duty to defend arises when the insurer " '. . . ascertains facts which give rise to the potential of liability under the policy. . . .' " (*State Farm Mut. Auto. Ins. Co.* v. *Allstate Ins. Co.,* 9 Cal.App.3d 508, 526 [88 Cal.Rptr. 246].) Under well established law it seems quite settled that Chicken Delight had an exposure in the Radakovic action on some theory or other,[7] that State Farm's position that Chicken Delight lost any right to be defended simply because it made its unsuccessful motion for a summary judgment is erroneous and that the duty to defend under the omnibus clause came into play simply because the Radakovic complaint alleged an agency relationship which, if proved, would have made Chicken Delight vicariously liable for Hutchins' tort.[8]

---

[7] In opposition to Chicken Delight's motion for summary judgment in that case Radakovic successfully cited *Porter* v. *Arthur Murray, Inc.,* 249 Cal.App.2d 410 [57 Cal.Rptr. 554] and *Nichols* v. *Arthur Murray, Inc.,* 248 Cal.App.2d 610 [56 Cal. Rptr. 728].

[8] State Farm never claimed that Chicken Delight's initial appearance and its activities in the Radakovic case before tendering the defense, were in violation of the insurance contract. (See fn. 5, *ante.*)

■ We also accept that where the insurer wrongfully refused to defend, he does so at his own risk and may be liable for the full amount of the detriment which the refusal causes the wronged insured, regardless of the insurer's policy limit. (*Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883]; cf. *Crisci* v. *Security Ins. Co.,* 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173].)

Nevertheless, as far as the proven facts of this case are concerned, they demonstrate that these well established principles simply do not apply.

From the outset the parties were faced with a claim in which State Farm's policy limit of $15,000 would never suffice to buy everyone's peace. Realizing this, Mr. Bradish let it be known that his $15,000 were "on the line." In other words the full limit of State Farm's exposure was available to those parties who would have to pay the lion's share of any settlement. Principally, of course—the vicarious liability of Swan being conceded—these were Allstate and Chicago.

Chicken Delight—or more realistically its insurer, Travelers—was in a slightly different position. An eventual judgment against Chicken Delight was quite debatable. On the other hand the risk of having to pay a substantial share of such a judgment, if Chicken Delight were found vicariously responsible, was great. We do not have the terms of the Travelers' policy before us and therefore do not know whether that company ran the risk of having to pay, on a proration basis, almost 90 percent of any judgment. It seems certain, however, that Travelers would have been solely responsible for any award over $130,000.

That, in brief, was the undisputed situation with which the parties were faced. Whether State Farm was wrong in refusing to defend Chicken Delight is unimportant. What matters is that the trial court was entitled to infer that with so much money at risk, Chicken Delight would not have simply turned the defense of the Radakovic action over to an insurer who was willing to contribute its entire exposure toward a settlement. The chances that counsel who had already appeared for Chicken Delight would continue to be associated in the defense in order to protect his client, were overwhelming. Nevertheless Chicken Delight utterly failed to prove what its legal expenses would have been, had State Farm agreed to defend it. Counsel simply testified to the total value of his services before and after December 1969. No attempt was made to show that less work would have been called for had Mr. Bradish replied affirmatively to the demand,

made that month, that State Farm defend Chicken Delight. (Cf. *Cirini-coni* v. *Green,* 175 Cal.App.2d 812, 816 [346 P.2d 867].)

■ Chicken Delight, of course, is principally interested in recovering its $15,000 contribution toward the Radakovic settlement. Naturally it builds its case on State Farm's assumed wrongful failure to defend. Clearly, however, this situation is the very one which was distinguished in *State Farm Mut. Auto. Ins. Co.* v. *Allstate Ins. Co., supra,* 9 Cal.App.3d 508, 528-531, where the court, in turn, distinguished a dictum in *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d 654, 659-660, to the effect that if the insured who should have been defended by the company has employed competent counsel to represent him and there has been no opportunity to compromise the claim within the policy limits, the liability of the insurer is limited to the amount of the policy plus attorney's fees and costs. In the case at bar no such distinction is possible: There never was a ghost of a chance of compromising the claim for $15,000 or less. State Farm at all times had offered its limit.

To sum up: State Farm may have been wrong in refusing to defend. Nothing however was shown that this refusal increased Chicken Delight's costs of defending or of buying its peace.

Since, in view of the circumstances of this case, Chicken Delight is not entitled to recover even under established principles of automobile insurance law, this is obviously not the occasion for making second-class insureds out of the beneficiaries of the statutory omnibus clause. (Ins. Code, § 1580.1.)

The judgment is affirmed.

Hastings, J., concurred.

**STEPHENS, J.**—I concur in the result reached in the majority opinion, but for entirely different reasons.

### The Facts[1]

On June 30, 1968, one Maria Radakovic, a pedestrian at the time, was struck by a Volkswagen that was being driven by one Robert Hutchins. At the time of the collision, Robert Hutchins was making a "delivery" on

---

[1]For a proper analysis, I feel constrained to include a restatement of the facts.

behalf of one Donald Swan, who was doing business as Chicken Delight of San Pedro (hereinafter, San Pedro). The Volkswagen was registered to Robert's mother, Maria Hutchins, and was specifically identified and insured under a State Farm Mutual automobile policy that was issued to Robert's father and mother: "Hutchins, Peter J. and Maria." The Volkswagen was further insured as a "non-ownership" automobile under an Allstate Insurance Company automobile policy that was issued to: "Chicken Delight [at] 29169 S Western Ave San Pedro Cal [the address of San Pedro]." Both the Allstate policy and the State Farm policy provided that the insurer would defend its insured against suits for damages insured under its policy. San Pedro also carried an excess coverage policy with Chicago Insurance Co. (hereinafter, Chicago), which apparently had a per person limit of $100,000. The precise terms of this policy are not of record.

On August 27, 1968, Maria Radakovic and her husband, Marko Radakovic, filed a civil complaint for damages arising out of the aforementioned collision (hereinafter, the Radakovic suit). The complaint named as defendants: Robert Hutchins, "Chicken Delight, Inc., a corporation and Does I through X, inclusive. . . ."

Thereafter, one of San Pedro's franchisers, Chicken Delight of California, Inc. (hereinafter, California), filed an answer in the Radakovic suit and moved for summary judgment on the ground that it was not responsible for the acts of either San Pedro or Robert Hutchins. California's motion for summary judgment was denied. California then notified Allstate and State Farm that California was claiming to fall within the definition of insured under both the Allstate policy and the State Farm policy.[2]

---

[2]Specifically, California claimed to fall within the Allstate policy's definition of "insured" as being "any person or organization legally responsible for the use [of the insured automobile], provided the actual use of the automobile is by the named insured or such spouse or with the permission of either."

In regard to State Farm, California claimed to fall within the State Farm policy's definition of insured as "any person or organization legally responsible for the use of such owned automobile by" "the named insured" or "if residents of the same household, the relatives of the first person named in the declarations, or of his spouse. . . ."

California's position was that, as San Pedro's franchisor, California was potentially liable for the acts of San Pedro and Robert Hutchins, and, therefore, that California was an "organization legally responsible" within the meaning of the Allstate policy and the State Farm policy.

These provisions were in compliance with California Insurance Code section 11580.1 as it read at the time of the accident. That section provided in part: "No policy of liability insurance covering liability arising out of the ownership, mainte-

California further demanded of Allstate and State Farm that Allstate and State Farm undertake California's defense in the Radakovic suit. Allstate and State Farm each denied that California fell within its definition of insured, and refused to undertake California's defense. Thereafter, on March 25, 1970, California filed a civil complaint for declaratory relief against Allstate and State Farm (hereinafter, the declaratory relief suit), asking for: a declaration that California fell within the definition of insured under both the Allstate policy and the State Farm policy; a declaration that Allstate and State Farm had had a duty to defend California in the Radakovic suit; and recovery of California's expenses incurred as a result of California's having to defend itself in the Radakovic suit.

Before the trial of the declaratory relief suit, another of San Pedro's franchisers, Chicken Delight, Inc., an Illinois corporation[3] (hereinafter, Illinois), filed an answer in the Radakovic suit and denied liability. Illinois then notified Allstate and State Farm that Illinois, like California, was claiming to fall within the definition of insured under both the Allstate policy and the State Farm policy and demanded that Allstate and State

nance or use of any motor vehicle shall be issued or delivered in this state to the owner of a motor vehicle, or shall be issued or delivered by any insurer licensed in this state, upon any motor vehicle then principally garaged or principally used in this state unless it contains the following provisions:

"(a) Provision with coverage limits at least equal to the financial responsibility requirements specified in Section 16059 of the Vehicle Code.

"(b) Provision designating by explicit description or by appropriate reference all motor vehicles with respect to which coverage is intended to be granted.

"(c) Provision designating by explicit description the purposes of use of such motor vehicles with respect to which coverage is not intended to be granted.

"(d) Provision insuring the insured named therein and to the same extent that coverage is afforded such named insured in respect to said described motor vehicles, any other person using, or legally responsible for the use of, said motor vehicles, provided the motor vehicles are being used by the named insured or with his permission, express or implied.

"(e) Notwithstanding the foregoing subdivisions, the insurer and any named insured may, by the terms of such policy or by a separate writing, agree that coverage under the policy shall not apply while said motor vehicles are being used by a natural person or persons designated by name. Such agreement by any named insured shall be binding upon every insured to whom such policy applies."

Aside from the statute, an insurance company has the right to limit policy coverage; when it has done so in harmony with the insured's reasonable expectations, the plain language of the limitation must be respected. (*Continental Cas. Co.* v. *Phoenix Constr. Co.*, 46 Cal.2d 423 [296 P.2d 801, 57 A.L.R.2d 914]; *Pacific Indem. Co.* v. *Liberty Mut. Ins. Co.*, 269 Cal.App.2d 793 [75 Cal.Rptr. 559].)

[3]Chicken Delight of California, Inc., a corporation, is a wholly owned subsidiary of Chicken Delight, Inc., an Illinois corporation. The Illinois corporation in turn is owned by Consolidated Foods, a corporation, which is not a party to this action.

Farm undertake Illinois' defense in the Radakovic suit.[4] Allstate and State Farm each denied that Illinois fell within its definition of insured, and refused to undertake Illinois' defense.

Then, still prior to the trial of California's declaratory relief suit, California and Illinois settled the Radakovic suit on their own behalf for $15,000. Thereafter, in further settlement of the Radakovic suit, Allstate paid its policy limit of $15,000 on behalf of Donald Swan and San Pedro, and State Farm paid its policy limit of $15,000 on behalf of Donald Swan, San Pedro, Robert Hutchins, Peter Hutchins, and Maria Hutchins, and Chicago paid $35,000, for a total of $80,000.[5]

Illinois then joined as an additional plaintiff in California's suit for declaratory relief. The declaratory relief suit was tried without a jury, and California and Illinois, without amending the prayer to the original declaratory relief complaint, asked the court that they be granted the additional relief of being reimbursed for the amount of the settlement ($15,000) that they had caused to be paid in the Radakovic suit.[6] The trial judge, how-

---

[4]The grounds of Illinois' claim that it fell within the definition of insured under the Allstate policy and the State Farm policy were the same as the grounds argued by California in support of Calfornia's claim that it, too, fell within the definition of insured under the Allstate and State Farm policies as either a named insured or as an additional insured.

[5]The total exposure of these three insurance companies was $130,000, and at no time was it suggested that this figure "was always on the line and available" when the California-Illinois request for defense was denied.

[6]By this time, of course, the character of the original declaratory relief suit had evolved into a suit for damages arising out of an alleged wrongful refusal to defend. The following in-court discussion between the court and the parties shows clearly that all were aware of this evolution:

"[Moore (attorney for Allstate)]: One further thing, your Honor: We've got the prayer in the declaratory relief complaint. I called the Court's attention to it. I suggest that the Court has to consider whether or not the prayer in the complaint asks for the relief that the [appellants] are here and arguing. . . .

"[Shafton (attorney for appellants)]: We also ask for such other and further relief as the Court may deem just and proper. A prayer isn't even an essential part of a complaint. You don't even have to put anything in as long as the answer has been filed to a complaint. I think such allegations in this complaint would justify everything we are asking for in final argument. That is a reimbursement for the $15,000 payment . . . .

"[The Court]: May I say it makes it somewhat difficult to prepare findings of fact or conclusions of law. The issues are very much different than those set forth in the complaint. The matter is submitted, gentlemen?

"[Shafton]: Submitted.

"[Moore]: Yes, your Honor.

"[Grover (attorney for State Farm)]: Yes."

(See: 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, Substantial Variance Cured by Trial, § 1061, pp. 2637-2638.)

ever, found that California and Illinois were "neither named insureds nor additional insureds under" the Allstate policy or the State Farm policy, and entered judgment in favor of Allstate and State Farm. California and Illinois appeal from that judgment.

Simply, California and Illinois' position on appeal is that Allstate's and State Farm's refusals to defend were wrongful, and that Allstate and State Farm are therefore liable to reimburse California and Illinois for the cost of California's and Illinois' defenses and for the amount of the settlement ($15,000) that California and Illinois caused to be paid.[7]

Certainly, if the trial judge in the declaratory relief suit was wrong in holding that California and Illinois were "neither named . . . nor additional insureds," then California and Illinois in fact held simple contractual rights to be defended, and the refusals to defend by Allstate and State Farm were wrongful. However, it cannot be held as a matter of law that the trial judge was wrong. California and Illinois were certainly not the named insured on either the Allstate or the State Farm policies, and the only possibility of California's or Illinois' falling within either Allstate's or State Farm's other definitions of insureds was to be found to be "an organization legally responsible for the use" of the Volkswagen by Robert Hutchins. Clearly, California and Illinois would have been "organizations legally responsible" in the event that a tort agency had existed between themselves and Robert Hutchins, but the only evidence of such an agency lay in the provisions of the written franchise agreement between Illinois, California, and San Pedro.[8]

---

[7] The majority opinion chooses not to reach this issue. Contrary to the conclusion of the majority (that "this is obviously not the occasion for making second-class insureds out of the beneficiaries [California and Illinois] of the statutory omnibus clause"—*ante*, p. 850), this issue *should* be determined here; it has been exhaustively briefed and argued by the litigants, and they should not be deprived of a judicial determination.

[8] "9. [San Pedro agrees that [*it*] *will accept and follow all reasonable recommendations made by [appellants] in the organization and operation of [San Pedro]* and the preparation and cooking of said foods, and that said foods shall be prepared and cooked at uniform and high quality.

"10. [San Pedro] agrees to purchase said chicken, fish, ribs, potatoes, muffins, and other materials only from sources of supply recommended by [appellants], to purchase only shrimp furnished by Booth Fisheries Corporation, and that all said materials shall be of a uniform and high quality. [Appellants agree] to secure for [San Pedro] lowest wholesale prices consistent with quantities ordered from all recommended sources of supply.

"11. [San Pedro] agrees to purchase an adequate number of cookers and fryers designed for rapid cooking and frying as recommended by [appellants].

"12. [San Pedro] agrees to purchase or lease one or more new delivery vehicles as

In the field of franchise agreements, the question of whether the franchisee is an independent contractor or an agent is ordinarily one of fact, depending on whether the franchisor exercises complete or substantial control over the franchisee. (*Kuchta* v. *Allied Builders Corp.*, 21 Cal.App. 3d 541, 547 [98 Cal.Rptr. 588].) Therefore, the question of whether California and Illinois held complete or substantial control over San Pedro's deliveries was a question of fact for the trial judge, and the franchise agreement between California, Illinois and San Pedro falls far short of establishing a tort agency as a matter of law. There is no error in the trial judge's findings that California and Illinois were "neither named insureds nor additional insureds under" the Allstate policy or the State Farm policy (see: 7 Appleman, Insurance Law & Practice (1972 Cumulative Supp.) Omnibus Clause—Persons Legally Responsible for Use, § 4355, pp. 368-371), and since California and Illinois were not in fact named or additional insureds, then neither held a simple contractual right to a defense.

California and Illinois argue in the alternative, however, that even if they did not actually fall within the definitions of insureds under either the Allstate policy or the State Farm policy, nonetheless, California and Illinois were "potential" insureds under these policies, and therefore held an extra-contractual right to be defended pursuant to the rule of *Gray* v. *Zurich Ins. Co.*, 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168].

In *Gray*, a Dr. Gray was the named insured under a personal liability insurance policy that was issued by Zurich. The policy expressly provided

recommended by [appellants] and will maintain a free and adequate delivery service of hot dinners and snacks within the territory described. . . .

"13. [San Pedro] agrees that [it] will lease and display at [its] place of business and on [its] delivery vehicles such electrical and other signs as may be in standard use in [appellants'] businesses. *[San Pedro] further agrees that [it] will place in operation any reasonable sales promotions recommended for the successful operation of said business by [appellants]*.

"14. [San Pedro] agrees that [it] will diligently operate said place of business a minimum of five days per week in a careful and business-like manner. In the event that after twelve (12) weeks of operation weekly sales are less than five hundred (500) dinners for a period of four successive weeks, [appellants] shall have the option of declaring a breach of this entire agreement.

"15. [San Pedro] agrees to maintain the premises and equipment which are to be used in the performance of this agreement in good repair and in high degree of cleanliness and sanitation, and agrees to make any reasonable improvements required by [appellants] within a period of thirty (30) days following such a request. It is understood and agreed that all improvements and maintenance shall be made at no expense to [appellants.]"

(All italics added.)

that Zurich would defend Dr. Gray in " 'any suit against [Dr. Gray] alleging . . . bodily injury or property damage and seeking damages which are payable under the terms of this [policy]. . . .' " (*Id.* at p. 267.) The policy provided further, however, that Dr. Gray was not insured against " 'bodily injury or property damages caused intentionally by or at the direction of [Dr. Gray].' " (*Id.*) Dr. Gray was sued for assault. Dr. Gray requested that Zurich defend him in the assault action, but Zurich refused on the ground that the action was for an intentional tort. Dr. Gray thereafter suffered a $6,000 judgment in the assault action. Dr. Gray then sued Zurich on the ground that Zurich had breached its duty to defend. Our Supreme Court ruled that Zurich's duty to defend was primary, and that the intentional-tort-exclusionary-clause was unclear. The Supreme Court went on to reason that, under the policy, Dr. Gray had a reasonable expectation that he was entitled to a defense; that irrespective of whether the exclusion actually applied to Dr. Gray, Zurich had a duty to "defend a suit which *potentially* seeks damages within the coverage of the policy" (*id.* at p. 275), and therefore that Zurich's refusal to defend made Zurich liable for the amount of the judgment returned against Dr. Gray.

*Gray,* of course, represented the case of a demand for a defense by the *named insured,* and Dr. Gray claimed "self-defense," which would have brought him within the policy. To answer the question posed by California and Illinois, it must be remembered that California, prior to settling with the Radakovics, had filed a motion for summary judgment wherein it disclaimed any interest in the vehicle driven by Hutchins and stated that the driver "has never been employed by [California] and has never been authorized or directed to act in any way on behalf of [California]."[9] If this statement were true, then plaintiffs here could not be an insured or an additional insured under the policy. It is recognized that the holding, and even the statements made, in the summary judgment motion are not binding in the instant action. They are, however, some evidence to be considered in determining the issue of agency-principal as charged in the Radakovics' complaint when that issue is litigated in the declaratory judgment action. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 341, p. 2009.) The settlement between California and Illinois and the Radakovics is not considered as tantamount to a judgment finding an agency-principal relationship; nor is the duty of an insurer to defend from the outset of an action those persons who are unquestionably insureds under

---

[9]While Illinois was not a party to this motion for summary judgment, nevertheless if California was not a principal, neither could Illinois be a principal.

the policy minimized. This leaves only the question of whether the *insured* is covered or indemnified.

In *State Farm Mut. Auto Ins. Co.* v. *Allstate Ins. Co.*, 9 Cal.App.3d 508, 526 [88 Cal.Rptr. 246], it is said: "The duty to defend, in any event, does not turn upon the ultimate adjudication of coverage but upon the facts known to the insurer at the inception of the third party's suit against its insured. 'An insurer . . . bears a duty to defend its *insured* whenever it ascertains facts which give rise to the potential of liability under the policy.' *(Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 276-277 [54 Cal.Rptr. 104; 419 P.2d 168].)" (Italics added.) However, the difference between the acknowledged insured being denied his right to defense and the denial of such an obligation to one honestly believed not to be an insured or additional insured must be recognized. Whether there is a duty of the insurer to defend a person *honestly believed not to be an insured or additional insured* is the question before us.

California and Illinois contend that "Whether or not the Radakovics would have been successful [against California and Illinois] or not, however, need not have been proved in order to require a judicial declaration that State Farm was required to indemnify plaintiffs. All that was needed by way of proof was that there was a potential liability since the potential of liability gives rise to the duty to defend." Relying upon *State Farm* v. *Allstate, supra,* California and Illinois argue: "As is suggested in *State Farm* v. *Allstate* . . . , an insurer when confronted with a situation in which a potential insured is making a demand for coverage has in effect three choices. The insurer can file a Complaint for Declaratory Relief to determine its right and obligations under the policy, it can defend under a reservation of rights, or it can refuse to participate in any way. If it chooses the third alternative and is found to be later incorrect, it must bear the consequences, including cost of defense incurred by its insured and liability for the insured's payment to the injured party even if that payment exceeds the limits of the policy of insurance." (*Id.* at pp. 530[10]-531.) The contention substitutes the words "potential *insured*"

---

[10]"Rose had been driving in the course of his employment by Wiemken and with the latter's permission, hence was an additional insured under the Allstate policy. A fact trier might reasonably conclude that Allstate's refusal to defend had triggered an expectable sequence of events, commencing with assumption of the defense by other insurers who had at least as good a claim to noncoverage as Allstate, if not better. Any insurance carrier is handicapped in settlement negotiations after it has accepted a tender of defense subject to a disclaimer of coverage. Because its duty to defend is independent of the ultimate question of coverage, its consideration of settlement offers is necessarily infused with conflicting loyalties. Thus Allstate would

for those used in the cases of *State Farm* and *Gray*: "potential [*of*] *liability*." (Italics added.) By virtue of this indiscriminate interchange of subject matter, California and Illinois would have the courts blindly apply a rule well summarized in 50 A.L.R.2d 458 at pages 463-464:

"Most liability insurance policies contain a provision obligating the insurer to defend the insured against all actions brought against him on the allegation of the facts and circumstances which are covered by the policy, even though such suits are groundless, false, or fraudulent.

"It is generally recognized that under such a policy provision, the obligation of a liability insurer to defend an action brought against the insured by the third party is to be determined by the allegations of the complaint in the action. Taking the allegations of the complaint as their basis, the courts have adopted the following tests for determining the merits of the claim that in an individual case the insurer is obligated to defend: If the complaint in the action brought against the insured upon its face alleges facts which come within the coverage of the liability policy, the insurer is obligated to assume the defense of the action, but if the alleged facts fail to bring the case within the policy coverage, the insurer is free of such obligation. Stated differently, the insurer is under an obligation to defend only if it would be held bound to indemnify the insured in case the injured person prevailed upon the allegations of his complaint. The above general rules and principles have been stated by the courts of various jurisdictions in more or less the same language, and all existing differences are more in the nature of variations in phraseology than in substance." (Fns. omitted.) The quotation from *State Farm* v. *Allstate, supra,* establishes that *there is* a right, albeit hazardous, for the insurer to "refuse to participate in any way," as California and Illinois argue.[11] The result under such choice, where the insurer was correct, was not dealt with in that case, and there has been no cited California case which has dealt with that narrow issue, with one clear exception: *Wint* v. *Fidelity & Casualty Co.,* 9 Cal.3d 257 [107 Cal.Rptr. 175, 507 P.2d 1383].

---

have faced settlement problems resembling those ultimately confronting State Farm. The point of the matter is that made in *Comunale* [v. *Traders & General Ins. Co.*], *supra* (50 Cal.2d at p. 660): an insurer denies coverage at its own risk and, although its action may not have been entirely groundless, it is liable for all the detriment caused by its breach. Had Allstate, at the inception of the coverage problem, sought an adjudication of its obligations under the policy, the adjudication would have enabled it to fulfill those obligations, including the implied obligation to give fair consideration to settlement offers. As we know, it did not seek such an adjudication."

[11]As is patently obvious from *State Farm, supra,* if the insurer *takes a risk* in his refusing to defend, *he has a choice* either to take the risk, or not.

In *Wint,* our Supreme Court considered the case of a demand for a defense, not by the named insured, but instead by a person who was claiming to fall within a policy's definition of insured as a " 'person . . . legally responsible . . . .' " (*Id.* at p. 264, fn. 2.) In *Wint,* one McGregor was in the business of renting pasture space for horses. Among the horses that were kept by McGregor was a horse that was owned by a Dr. Zundel. Dr. Zundel was also the named insured on a Glens Falls Insurance Company policy that provided that " 'The word "Insured" also includes . . . with respect to animals . . . owned by an Insured, any person or organization legally responsible therefor. . . .' " (*Id.* at p. 264, fn. 2.) The Glens Falls policy provided further, however, that the policy was not applicable " 'to any business pursuits of an Insured. . . .' " (*Id.*) One day, Dr. Zundel's horse escaped from McGregor's pasture and collided with an automobile driven by one Reece. Reece and the horse were killed. McGregor and Dr. Zundel were then sued for the wrongful death of Reece. McGregor notified Glens Falls that he was claiming to fall within the definition of insured under Dr. Zundel's Glens Falls policy because McGregor was a "person legally responsible" for the horse; further, McGregor demanded that Glens Falls undertake his defense in the wrongful death action. Glens Falls failed to provide a defense, and McGregor then agreed to a stipulated judgment of $18,000 in the wrongful death action. McGregor thereafter assigned to others whatever right of action he held against Glens Falls. McGregor's assignees then sued Glens Falls on the grounds that (1) McGregor fell within Glens Falls' definition of insured; (2) that the damages suffered by McGregor were covered in the Glens Falls policy; and (3) that even if McGregor's damages were not actually covered in the Glens Falls policy, nevertheless Glens Falls had wrongfully refused to defend McGregor. At trial, judgment was entered in favor of Glens Falls and against McGregor's assignees. On appeal, the Supreme Court affirmed the judgment in favor of Glens Falls, holding that McGregor's damages were not *actually* covered by the policy because of the policy's exclusion as to business pursuits, and that therefore he was *not* an additional insured. Further, the Supreme Court held that Glens Falls had not wrongfully refused to defend McGregor, stating (at pp. 264-265): "In *Gray* [v. *Zurich Ins. Co., supra,* 65 Cal.2d 263], this court indicated that in an insurance contract written by the more powerful bargainer (the insurer) to meet its own needs, and offered to the weaker party (the insured) on a 'take it or leave it' basis, the reasonable expectations of the latter may have significance in determining whether the former owes a duty to defend. In *Gray,* we found that the policy did not clearly

define the application of the exclusionary clause to the duty to defend, that the exclusionary clause was unclear, and that the insured could reasonably have expected that the protection he had purchased included a duty to defend him. *The person being sued in* Gray, *however, was the named insured, who had purchased and paid for the protection afforded by the policy. It is to the reasonable expectations of such a person that we must look in making our determination whether the protection includes the right to a defense. In other words, under the Glens Falls policy we must consider what the reasonable expectations of Dr. Zundel were—not the reasonable expectations of someone claiming to be an additional insured thereunder. In analyzing the situation, we have concluded that it would be unreasonable for Dr. Zundel to have assumed that part of the premium he paid for the policy was to purchase the protection of a defense to someone claiming to be an additional insured when such person, because of a clear exclusionary clause in the policy, actually had no basis for sustaining his claim of being covered thereunder.* Furthermore, our holding in *Gray* is premised upon a finding that the policy provisions reasonably led the insured to expect to be defended. Here, McGregor had never seen the policy and probably did not even know of its existence, and hence cannot claim that it reasonably led him to expect to be defended. Under the circumstances, the trial court properly found in favor of Glens Falls." (Italics added.) Clearly, one rule to be drawn from *Wint* is that the *Gray* duty to defend does not arise automatically upon the filing of a complaint that alleges facts which, if true, would cause a defendant who was allegedly an unnamed insured to fall within some policy's definition of an additional insured.[12] *Instead, the inescapable result of* Wint *is that the* Gray *duty to defend will arise only from the ashes of a disappointment of an expectation of a defense whenever that expectation can be shown to have been reasonable.*

Therefore, if California and Illinois were in fact entitled to a *Gray* right to be defended, that right did not arise out of the fact that the Radakovics may have made allegations which, if true, would have made California and Illinois "legally responsible" for the Volkswagen, but, instead, that right could only have arisen out of the *disappointment of a reasonable expectation to be defended.* In *Wint,* of course, the Supreme

---

[12]The validity of this conclusion is demonstrated by the facts that McGregor was named in the complaint for the wrongful death, and the allegations of the complaint, if true, would have caused McGregor to fall within the Glens Falls' definition of insured as a "person . . . legally responsible," but, notwithstanding, the Supreme Court held that McGregor held no *Gray* right to a Glens Falls' defense.

Court declared that we "must consider the reasonable expectations of [the named insured]—*not the reasonable expectations of someone claiming to be an additional insured*" (*id.* at p. 265; italics added), and *Wint* then went on to hold that the named insured in that case, Dr. Zundel, could not reasonably have "assumed that part of the premium he paid for the policy was to purchase the protection of a defense to someone claiming to be an additional insured, when such person, because of a clear exclusionary clause in the policy, actually had no basis for sustaining his claim of being covered thereunder" (*id.* at p. 265).

In the case before us, therefore, it cannot be determined whether California and Illinois held a *Gray* right to be defended without first examining the expectations of the named insureds of the State Farm policy, Peter and Maria Hutchins, and the named insured under the Allstate policy, San Pedro.

In regard to Peter and Maria Hutchins, of course, neither could have reasonably expected that the insurance premium that they caused to be paid to State Farm was to buy a legal defense for corporations that were in fact not additional insureds under the policy.

Likewise, San Pedro could not have reasonably expected that the insurance premium that it caused to be paid to Allstate was to buy a legal defense for California and Illinois because (1) California and Illinois did *in fact* not fall within Allstate's omnibus definition of insured as an "organization legally responsible," and because (2) even if California and Illinois had been organizations "legally responsible," nonetheless the "non-ownership" endorsement of the Allstate policy which applied to the Volkswagen clearly limited the definition of insured to the named insured and the employees of the named insured.[13]

Neither the named insureds of the State Farm policy nor the named insured of the Allstate policy could reasonably have been disappointed by State Farm's and Allstate's refusal to defend California and Illinois in the Radakovics' suit.

---

[13]Specifically, the "non-ownership" endorsement to the Allstate policy provided in part as follows: "1. DEFINITIONS. The words 'non-owned automobile' shall mean a land motor vehicle . . . not owned by, registered in the name of, hired by or loaned to the named insured. . . . 2. APPLICATION OF INSURANCE. (a) The insurance applies only to . . . the named insured. . . . (b) The insurance applies only to the use, *by any person other than the named insured, of any non-owned private passenger automobile in the business of the named insured.*" (Italics added.)

The Volkswagen was a "non-owned automobile," and California and Illinois were

Further, like the alleged additional insured in *Wint,* there is no evidence that either California or Illinois had ever "seen the polic[ies] and probably did not even know of [their] existence, and hence cannot claim that [they] reasonably led [either] to expect to be defended." (*Id.* at p. 265.)

In summary, then, California and Illinois held no contractual right to a defense, because California and Illinois were in fact not insureds under the State Farm policy or the Allstate policy, and California and Illinois held no *Gray* right to a defense, because neither the named insureds under the Allstate policy and the State Farm policy, nor California and Illinois, suffered *a disappointment of a reasonable expectation* that California and Illinois would be defended.[14]

The narrow question before us has been considered in other jurisdictions: In *Navajo Freight Lines, Inc.* v. *Liberty Mutual Ins. Co.* (1970) 12 Ariz.App. 424 [471 P.2d 309, 315], the Court of Appeals of that state said, in referring to the 50 A.L.R.2d quotation hereinabove set forth: "In all of the cases considered in this annotation no question was raised or involved as to the existence of the underlying relationship of insurer and insured—in other words, these cases assumed an insurer-insured relationship and then dealt with the extent of the insurer's duty to defend the insured under its contract as embodied in the policy. Since these contractual provisions generally impose an obligation to defend against any suit alleging the occurrence of risks insured against even if the suit is groundless, false or fraudulent, the courts have correctly held that by the use of such language in the policy, the insurer has imposed upon itself a contractual duty to defend its insured against suits alleging facts, which if proven, would constitute a risk insured against under the provisions of the policy. However, these contractual provisions do not purport to obligate the insurer to defend a complete stranger to the contract. A *sine qua*

neither the named insured nor employees of San Pedro. It would seem, therefore, that California and Illinois did not fall within the definitions of insureds under the "non-ownership" endorsement of the Allstate Policy. The trial court was correct in its holding that California and Illinois were not additional insureds through the theory of agent-principal.

[14]Since the judgment is being affirmed, it is unnecessary to consider the measure of damages to which California and Illinois would have been entitled in the event that there had been a wrongful refusal to defend. It should be noted, however, that a wrongful refusal to defend will expose the insurer to liability for the costs of the defense and for the amount of the judgment, not to exceed policy limits, and a wrongful refusal to defend, when coupled with a wrongful refusal to settle, will expose the insurer to the costs of the defense and the amount of the judgment irrespective of policy limits. (*Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883].)

*non* to the existence of any obligation to defend, or pay, whether the suit be groundless or otherwise, is the pre-existing relationship of insurer-insured. The creation of this basic relationship cannot be left to the imagination of the drafter of a complaint." (Italics added.)

In *Keithan* v. *Massachusetts Bonding & Ins. Co.* (1970) 159 Conn. 128 [267 A.2d 660], the Supreme Court of that state stated (at pp. 666-667): "We have summarized the factual situation, the rule and the claims of the appellants in some detail because we have neither found nor has any party referred to us any Connecticut case which has involved consideration of the precise question now raised. Here it has been adjudicated that a party, Keithan, was in fact not an insured under a liability policy, but he nevertheless claims that the insurer under that policy owed him a duty of defense in a prior case because a third party, Werner, had alleged in that case facts which, had they been true, would have established that he was an insured under the policy and therefore entitled to a defense by the insurer which had contracted to 'defend any suit against the insured.'

"It is of course obvious that by the commonly used omnibus clause the insurer has committed to the named insured through the right to grant permission a wide capacity to determine who will be accorded the status of an insured and under what circumstances coverage will be extended. The hazards of proof on an issue of the existence of permission, the results of which follow under the rule of the *Missionaries* case where an insurer in fact has the duty to defend and fails to do so, and the practicality of furnishing a defense under a reservation of rights suggest good reason why cases such as the present one have rarely arisen. The few courts which appear to have had occasion to consider the precise narrow issue now before us are not in harmony. On the one hand, Holland America Ins. Co. v. National Indemnity Co., 75 Wash.2d 909, 454 P.2d 383, Allstate Ins. Co. v. Lumbermen's Mutual Casualty Co., 204 F.Supp. 83 (D.Conn.), Heyden Newport Chemical Corporation v. Southern General Ins. Co., 387 S.W.2d 22 (Tex.), and Allstate Ins. Co. v. Gleason, 50 Ill.App.2d 207, 200 N.E.2d 383, hold that the insurer is under a duty to defend where the third party's complaint alleges facts which, if true, would bring the operator within the provisions of the policy as an insured. On the other hand, Butler v. Maryland Casualty Co., 147 F.Supp. 391 (E.D.La.), Smith v. Ins. Co. of State of Pa., 161 So.2d 903 (La.App.), cert. den., 246 La. 344, 164 So.2d 350, Southern Underwriters v. Dunn, 96 F.2d 224 (5th Cir.), and Ricciardi v. Bernasconi, 105 N.J.Super. 525, 253 A.2d 487, hold to the contrary. In connection with the latter case see also

Travelers Ins. Co. v. Tymkow, 91 N.J.Super. 184, 219 A.2d 625, modifying Travelers Ins. Co. v. Tymkow, 87 N.J.Super. 107, 208 A.2d 176.

"As the court noted in Smith v. Ins. Co. of State of Pa., supra, 161 So.2d 919: 'If the defendant is neither the named insured nor an omnibus insured there is clearly no obligation to defend regardless of the allegations of the petition and irrespective of the soundness or groundlessness of the claim asserted. To hold otherwise is to completely erase from the policy the qualifying phrase "against the insured," contained in Clause II (a) . . . .' Also, as stated in Travelers Ins. Co v. Tymkow, 87 N.J. Super. 107, 113, 208 A.2d 176, 179-180: 'It can certainly not have been the intention of the named assured . . . to provide insurance benefits for any and all alleged principals that an injured third party could dream up.'

"We find the logic and reasoning of such cases as the *Smith* case persuasive under the circumstances of the present case. Since Keithan was not an insured under the Mass. Bonding policy and since the contract duty of the insurer was limited to providing a defense to any suit 'against the insured,' Mass. Bonding performed its full contract duty in providing a defense to Porto, its insured, and was under no contract duty to provide a defense for an uninsured stranger to the contract such as Keithan, simply because a third party had alleged facts which, if true, would have given Keithan the status of an insured. The insurer contracted to defend the insured against a suit 'even if such suit is groundless, false or fraudulent,' and a breach of that agreement is the basis for liability imposed in such cases as Missionaries of the Company of Mary, Inc. v. Aetna Casualty & Surety Co., 155 Conn. 104, 113, 230 A.2d 21. The insurer, Mass. Bonding, did not, however, contract to defend any party who is not in fact an insured, and since, as the court properly determined, Keithan was not an insured, Mass. Bonding owed him no duty of defense. The court properly rendered judgment for Mass. Bonding in Keithan's action against that company."[15]

The reasoning and analyses of both *Navajo* and *Keithan* are in line with the reasoning and analysis in *Wint,* where our Supreme Court clearly teaches us that in the instant case there was no obligation for either Allstate

---

[15]See also 7A Appleman, Insurance Law and Practice, Duty to Defend Insured—Reference to Pleadings, § 4683, pp. 447-448, "A mere allegation that the defendant is the insured under the policy does not obligate the insurer to defend where the defendant is not in fact an insured, named or omnibus." (But see *Holland America Ins. Co.* v. *National Indemnity Co.* (1969) 75 Wn.2d 909 [454 P.2d 383, 386].)

or State Farm to defend California or Illinois. The finding of the trial court in the declaratory relief action, in which California and Illinois sought the declaration of the court that they stood in the position of principals and hence were entitled to be defended and indemnified, may not be upset merely because it was adverse to plaintiffs in that action. Nor did there exist any disappointment by the named insured because of a reasonable expectation of defense. *To find a disappointment on the part of California after it filed a motion for summary judgment (supported by proper memoranda), in which it denied any principal-agent relationship between it and San Pedro, is totally unreasonable.* Likewise, it cannot be said that Allstate and State Farm could not reasonably rely upon those contentions made by California in its denial of the principal-agency relationship.[16] While Illinois was not a party to the summary judgment motion, nevertheless it is only logical to conclude that if California was not a principal, neither could Illinois be; hence, the reasonable refusal to defend Illinois logically followed.

Accordingly, I would affirm the judgment on the principles and analysis above set forth, rather than those on which the majority opinion is predicated.

---

[16]In its supporting memorandum to its motion for summary judgment, California states: "California had no interest in the vehicle driven by John Robert Hutchins; it had never employed John Robert Hutchins; it had never authorized Hutchins to act in any way on its behalf. Donald Swan's (Hutchins' employer) relationship with California was solely that of a franchisee; at no time did Swan ever act inconsistently with the status of sole proprietor; California's only control ever asserted was the control necessary to protect its trademark; franchisees are considered by California to be independent businessmen; neither Swan nor Hutchins ever received any salary or remuneration from California; California never had any control over the hiring or firing of employees of Don Swan's Chicken Delight store located at 530 South Gaffey, San Pedro; California makes no direct profit from the operation of the store, and California's only profits come from the selling of supplies to its various franchisees."